IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MICHAEL J. HOFFMAN, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-17-2431 |
| DEPARTMENT OF PUBLIC SAFETY | * | |
| AND CORRECTIONAL SERVICES, et al., | * | |
| Defendants. | * | |

*****

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Krista Bilak (n/k/a Krista Self), N.P., Robustianno Barrera, M.D., Mahboob Ashraf, M.D., Holly Pierce, N.P., William Beeman, R.N., Stacie Mast, R.N., Wexford Health Source, Inc., (collectively, "Medical Defendants") Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 19) and Department of Public Safety and Correctional Services' ("DPSCS") Motion to Dismiss (ECF No. 30). The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will deny Medical Defendants' Motion without prejudice and grant DPSCS's Motion.

# I.    BACKGROUND[1]

## A.    Factual Background

In his Verified Complaint,[2] Hoffman alleges that he has been denied constitutionally adequate medical care. He states that he has been "diagnosed with: chronic interstitial lung disease, degenerative bone disease in both knees and right foot, significant abnormal areas of activity involving urinary bladder and both kidneys." (Compl. ¶ 1, ECF No. 1) (alteration to capitalization).

### 1.    Lung Issues

As to the issues regarding his chronic lung pain, Hoffman alleges that on May 27, 2016, Bilak told Hoffman that he has Chronic Obstructive Pulmonary Disease and refused to order a PET scan or pain medication to treat his disease because Hoffman was "making everything up." (Id. ¶ 11).

On June 6, 2016, Dr. Ashraf saw Hoffman and prescribed him Tylenol #3[3] for the lung pain he was experiencing. (Id. ¶ 12). Dr. Ashraf examined Hoffman again on July 7, 2016, and because "the treatment plan along with one (1) Tylenol #3 twice a day proved to

---

[1] Unless otherwise noted, the facts outlined here are set forth in Hoffman's Complaint (ECF No. 1). To the extent the Court discusses facts that Hoffman does not allege in his Complaint, they are uncontroverted and the Court views them in the light most favorable to Hoffman. The Court will address additional facts when discussing applicable law.

[2] (See Compl. at 31, ECF No. 1).

[3] Tylenol #3 is a combination of Tylenol (acetaminophen) and codeine, a narcotic pain reliever, which is used to relieve mild to moderate pain. U.S. Nat'l Library of Medicine, Acetaminophen and Codeine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a601005.html (last visited Mar. 22, 2019).

stabilize pain and vitals," Dr. Ashraf continued Hoffman's medication until August 7, 2016. (Id. ¶ 13).

On August 9, 2016, Pierce refused to renew Hoffman's prescription for Tylenol #3, advising him that she would not give him narcotics and noting that he was getting Baclofen for pain relief. (Id. ¶ 14). She advised Hoffman that she would refer him to Dr. Ashraf but failed to do so. (Id. ¶¶ 14–15). After ten days of "suffering with pain in [his] lungs and upper back," Hoffman submitted a sick call slip. (Id. ¶ 15). On August 19, 2016, Rick Moyer, RN saw Hoffman and also advised that she would refer Hoffman to Dr. Ashraf. (Id. ¶ 16). She failed to do so. (See id. ¶¶ 16–19). Ten days later, Hoffman submitted another sick call slip requesting "relief of pain in his lungs and test[s] to determine the damage to his lungs." (Id. ¶ 17). Hoffman submitted yet another sick call slip complaining of "lung pain" on August 26, 2016. (Id. ¶ 18). On August 29, 2016, Amy Booth, RN saw Hoffman. (Id. ¶ 19). Hoffman requested to see a provider, and Booth indicated she would submit the referral. (Id.).

On August 30, 2016, Pierce saw Hoffman. (Id. ¶ 20). Hoffman states that while it is not reflected in Pierce's report, she was patronizing to him, displayed hatred towards him, and "put[ ] a show on for the correctional officers who were in attendance." (Id.). He alleges that Pierce "showed satisfaction" that she had denied him pain medication. (Id.). At the appointment, Hoffman again requested to be seen by Dr. Ashraf. (Id.).

On September 2, 2016, Hoffman was scheduled for an appointment with Pierce, but she "made a false claim stating, 'issue resolved on previous visit.'" (Id. ¶ 21). Pierce saw Hoffman again on September 29, 2016. (Id. ¶ 22). Hoffman alleges that, except for the

anxiety and stress that she noted Hoffman was suffering from, Pierce falsified the report from the appointment. (<u>Id.</u>). She refused to refer Hoffman to see the doctor. (<u>Id.</u>). Hoffman questions why he was prescribed Mobic and Prednisone for pain if he was not complaining of pain during this encounter. (<u>Id.</u>).

On October 5, 2016, Marilyn Evans, RN saw Hoffman due to continued pain from his chronic interstitial lung disease that his medication did not alleviate. (<u>Id.</u> ¶ 23). Evans advised Hoffman that she would refer him to a provider. (<u>Id.</u>). The following day, while in "terrible pain," Hoffman was scheduled to see Pierce for a chronic care visit. (<u>Id.</u> ¶ 24). Hoffman alleges that Pierce violated her duties as a medical provider during this visit but does not explain how. (<u>Id.</u>).

On October 12, 2016, Hoffman submitted another sick call request, again seeking relief from the pain caused by his chronic interstitial lung disease. (<u>Id.</u> ¶ 25). Hoffman explains that he later learned that Beeman is responsible for assigning care providers for scheduled visits. (<u>Id.</u>). He further explains that Beeman was aware of the conflict between Hoffman and Pierce and was informed of the grievance Hoffman filed against Pierce on October 12, 2016 (Case No. NBCI 2305-16). (<u>Id.</u>). Beeman scheduled Pierce to see Hoffman on October 14, 2016, which Hoffman alleges Beeman did despite "knowing she [was] going to retaliate against [him] for filing a grievance against her." (<u>Id.</u>).

Pierce evaluated Hoffman on October 14, 2016, in the presence of Officer Michael Gutillo. (<u>Id.</u> ¶ 28). Hoffman advised Pierce that he was experiencing chest and lung pain and requested a referral to a doctor. (<u>Id.</u>). Pierce refused to refer Hoffman, instead pointing to herself and saying, "I am a doctor." (<u>Id.</u>). Hoffman advised Pierce he was going to file a

grievance against her to which she replied, "Join the club." (Id.). Later, Pierce "willfully filed and fabricated" a report about the encounter. (Id. ¶ 29).

On October 17, 2016, Hoffman filed a grievance (NBCI 2295-16) against Pierce concerning what he alleged were her "unprofessional conduct and negligence" during his October 14, 2016 appointment. (Id. ¶ 30). In retaliation for that grievance, on October 27, 2016, Pierce made a false claim that Hoffman had threatened her. (Id. ¶ 31). That same day, Hoffman was placed on administrative segregation for forty days. (Id.). Hoffman alleges that due to the personal relationship between Pierce and a correctional officer, he was removed from general population without an infraction being written against him. (Id.).

On November 13, 2016, Hoffman filed a sick call slip complaining of pain caused by his chronic interstitial lung disease. (Id.).[4] Bilak saw Hoffman on November 17, 2016. (Id. ¶ 32). Because Hoffman was on administrative segregation at the time, his hands were cuffed behind his back and he was escorted to the exam room by Officer Deist who was present for the examination. (Id.). Bilak was hostile and unprofessional to Hoffman. (Id.). When Hoffman advised that the medication was no longer working, she responded, "What do you want me to do about it!" She also told Hoffman that he had been given a CT and bone scan which showed he had "mild COPD." (Id.). She explained that because they had done "all that is medically required," they were not going to do any further investigation into the source of his lung pain, and that Hoffman needed to "deal with it!" (Id.). When

---

[4] Hoffman's Complaint contains two paragraphs thirty-one and thirty-two. This citation refers to the second paragraph thirty-one on page thirteen.

Hoffman persisted in asking what was causing him pain, Bilak responded by hitting Hoffman in the arm with her blood pressure cuff and yelling for Officer Deist to "Get him out of here!" (Id.). As Officer Deist escorted Hoffman back to his cell he said, "I am surprise[d] she still works here." (Id.). Hoffman states that Bilak's account of this encounter is "imaginative, deceitful, and fabricated." (Id. ¶ 34) (spelling altered). Bilak reported that Hoffman threatened her, stating, "I will get you, you wait, this isn't over," and was then escorted out of the medical department. (Id. ¶ 35). Hoffman asserts that the fact that Officer Deist was present for this alleged threat and yet Hoffman was not formally charged with threatening staff demonstrates that the threat did not happen. (Id.). On November 30, 2016, Hoffman filed a grievance against Bilak (NBCI-2646-16). (Id. ¶ 33).

On December 3, 2016, Hoffman submitted a sick call slip complaining of pain in his lungs. (Id. ¶ 36). On December 6, 2016, Mast saw Hoffman and she referred him to a provider. (Id. ¶ 37). Beeman, aware of the grievances Hoffman had filed against Pierce and Bilak, assigned Hoffman to see Bilak on December 12, 2016. (Id. ¶ 38). Hoffman states that he was walking, unescorted, to the examination room in his housing unit when he saw Bilak in the hallway with three correctional officers and heard her tell them that he had threatened her. (Id. ¶ 40). The officers appeared dumbfounded by the charge and took no action. (Id.). Hoffman claims that Bilak did not put in her report that she told the officers that Hoffman had threatened her and instead made "up another story claiming [Hoffman] was loud and agitated." (Id. ¶ 41).

On December 20, 2016, Moyer saw Hoffman in response to his sick call filed on December 16, 2016, complaining of pain throughout his body. (Id. ¶¶ 42–43). One day

later, Bilak saw Hoffman for a chronic care visit. (Id. ¶ 44). Hoffman indicates that it is odd that Bilak would see him again when she twice claimed that he had threatened her. (Id.). He alleges that Bilak "cherry picked" through his medical records to demonstrate her concern for his health. (Id. ¶ 45). He states that her report of the December 21, 2016 appointment was an effort to "make her look like a professional caregiver. If [he] had a computer and a printer he can fool people with a made[-]up report to make him look like a professional to[o]." (Id.).

On June 7, 2017, Hoffman sent a fact sheet from the American Cancer Society regarding interstitial lung disease through the sick call box, attached a copy of the fact sheet to a grievance he filed, and took the sheet with him to his sick call visits. (Id. ¶ 53). When Hoffman attempted to give the sheet to medical providers, they refused to accept it. (Id.). Hoffman alleges that he has received no treatment for his lung condition and that the condition is worsening. (Id. ¶ 50).

On July 29, 2017, Mast saw Hoffman. (Id. ¶ 51). She advised Hoffman that "there [is] no treatment for 'chronic interstitial lung disease.'"[5] (Id.). Hoffman notes that her report indicates that he was not complaining of pain and yet the chief complaint noted on the report is "lung pain." (Id. ¶ 55). She also noted that Hoffman had previously told her that he was in end stage lung disease for which there is no cure other than a lung transplant. (Id. ¶ 56). Hoffman questions if this were true why his relaying the information about his

---

[5] Hoffman also alleges that Mast failed to include her July 5, 2017 report that she told him there was no treatment of interstitial lung disease. (Compl. ¶ 55). She also noted that Hoffman did not complain of pain, but he states that all of his examinations were because of pain. (Id.).

lung disease was not contained in earlier medical reports. (Id.). That day, Hoffman filed a grievance against Mast for what he deemed to be her unprofessional conduct. (Id. ¶ 52).

Hoffman believes that he has "lung cancer or tumors in his lungs." (Id. at 26). He states that he needs an "MRI, lung biopsy[,] and PET scan." (Id. at 27). Hoffman pleads that he knows he has cancer due to the increase in his pain and that Medical Defendants refuse to treat him because of the grievances he has filed. (Id. at 29). Hoffman alleges that Medical Defendants wait until a patient is diagnosed with end state cancer before providing treatment. (Id. at 28). He states that he has "never met a[n] inmate with early stage cancer who has received treatment for said cancer." (Id.). He further alleges that Medical Defendants have a policy of not providing tests such as MRIs or PET scans that could catch early stage cancer. (Id. at 29). Rather, they wait until the cancer is not treatable and then move the inmate to another institution to die. (Id.).

### 2. Bladder Issues

On June 6, 2017, Hoffman filed a grievance regarding his uncontrollable urination that started in January 2017. (Id. ¶ 47). He states that although he received "two treatments with antibiotics[, he] still couldn't control his urination." (Id.). On June 8, 2017, Lt. George McAlpine dismissed the grievance without investigation. (Id.). Hoffman pleads that as of the filing of his Complaint, he continues to suffer and that his condition was worsening to the point that he is experiencing uncontrollable urination three to four times a day. (Id.; id. at 25). He states that he filed "numerous" sick call slips but was not getting any treatment for this condition. (Id. ¶ 47). Hoffman believes he has "irreversible . . . bladder and colon damage" and the only way to determine what needs to be done to treat it is to perform an

MRI or PET scan. (Id. at 27). He claims that more tests should have been done to rule out colon cancer. (Id.).

### 3. Knee and Foot Issues

On June 8, 2017, Hoffman filed a grievance concerning the "'[d]egenerative' disease in both [of his] knee[s] and [his] right foot." (Id. ¶ 49). Hoffman explains that he was diagnosed with this disease in April 2016 through a bone scan. (Id.). He alleges that up until the filing of his Complaint, he has received no relief. (Id.).

### 4. Retaliation

Hoffman alleges that after he informed Pierce and Bilak that he had been an IV drug user their attitudes toward him changed and they did not care about his disease. (Id. at 25). Hoffman further alleges that because of the grievances he has filed against Medical Defendants, they are retaliating against him by not providing him with necessary medical treatment for his conditions. (Id. at 26).

## B. Procedural Background

On August 24, 2017, Hoffman, proceeding pro se, sued Medical Defendants. (ECF No. 1). Construing Hoffman's Complaint liberally, he alleges violations of the Eighth Amendment to the U.S. Constitution for deliberate indifferent to his medical needs and the First Amendment for retaliating against him for filing grievances against Medical Defendants related to his medical care. Hoffman seeks declaratory and injunctive relief, requesting that he be sent to an outside medical facility, either the University of Maryland or Johns Hopkins Hospital, so that a lung biopsy, MRI, PET scan, x-ray, and blood work

can be performed. (Compl. at 30). He also requests compensatory and punitive damages as well as the costs of litigation. (Id.).

On March 5, 2018, Medical Defendants filed their Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 19). Hoffman filed his Opposition on March 19, 2018. (ECF No. 23). On March 26, 2018, Medical Defendants filed a Reply. (ECF No. 25).

On April 3, 2018, DPSCS filed its Motion to Dismiss. (ECF No. 30). Hoffman filed an Opposition on April 13, 2018. (ECF No. 39). To date, the Court has no record that DPSCS filed a Reply.

## II. DISCUSSION

### A. DPSCS's Motion to Dismiss

#### 1. Rule 12 (b)(6) Standard of Review

The purpose of a Rule 12(b)(6) motion is to "test[ ] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of America, N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd sub nom., Goss v. Bank of America, NA, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

Pro se pleadings are liberally construed and held to a less stringent standard than pleadings drafted by lawyers. Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)); accord Brown v. N.C. Dep't of Corr., 612 F.3d 720, 722 (4th Cir. 2010). Pro se complaints are entitled to special care to determine whether any possible set of facts would entitle the plaintiff to relief. Hughes v. Rowe, 449 U.S. 5, 9–10 (1980). But even a pro se complaint must be dismissed if it does not allege "a plausible claim for relief." Forquer v. Schlee, No. RDB-12-969, 2012 WL 6087491, at *3 (D.Md.

Dec.4, 2012) (quoting <u>Iqbal</u>, 556 U.S. at 679). "While pro se complaints may 'represent the work of an untutored hand requiring special judicial solicitude,' a district court is not required to recognize 'obscure or extravagant claims defying the most concerted efforts to unravel them.'" <u>Weller v. Dep't of Soc. Servs. for the City of Balt.</u>, 901 F.2d 387, 391 (4th Cir.1990) (quoting <u>Beaudett v. City of Hampton</u>, 775 F.2d 1274, 1277 (4th Cir.1985)).

### 2. Analysis

DPSCS advances two arguments in favor of dismissal of the Complaint: (1) DPSCS is not a "person" under § 1983, and therefore is not subject to suit; and (2) DPSCS is entitled to Eleventh Amendment immunity. The Court agrees with DPSCS's second argument.

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." U.S. Const. amend. XI. Notwithstanding the Eleventh Amendment's explicit mention of only "Citizens of another State," <u>id.</u>, the Supreme Court of the United States has construed the Eleventh Amendment as also protecting states from federal court suits brought by the state's own citizens. <u>Lee-Thomas v. Prince George's Cty. Pub. Sch.</u>, 666 F.3d 244, 248 (4th Cir. 2012) (quoting <u>Port Auth. Trans-Hudson Corp. v. Feeney</u>, 495 U.S. 299, 304 (1990)). This immunity, however, is not absolute, as Congress and state legislatures may waive it. <u>Id.</u> at 249. The State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts. <u>See</u> Md. Code Ann., State

Gov't., § 12–201 (West 2018). It has not, however, waived its immunity under the Eleventh Amendment to a suit of this kind.

The States' immunity extends to "state agents and instrumentalities." Lee-Thomas, 666 F.3d at 248 (quoting Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429 (1997)). DPSCS is a state agency. See Md. Code. Ann., Corr. Servs. § 1-101(f) (West 2018). Because DPSCS is "an arm of the state for purposes of § 1983," it is "immune from a suit under § 1983." Clark v. Md. Dep't of Pub. Safety & Corr. Servs., 316 F.App'x 279, 282 (4th Cir. 2009). Here, Hoffman sues DPSCS. But the Eleventh Amendment provides DPSCS immunity from suit under § 1983. The Court, therefore, concludes that Hoffman fails to state a claim against DPSCS as a matter of law.

## A.   Medical Defendants' Motion to Dismiss or, in the Alterative, for Summary Judgment

### 1.   Conversion of Medical Defendants' Motion

Medical Defendants' Motion is styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Rule 56. Motions styled in this manner implicate the Court's discretion under Rule 12(d). See Kensington Vol. Fire Dep't., Inc. v. Montgomery Cty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6)

motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). The Court "does not have an obligation to notify parties of the obvious." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise the issue that more discovery is needed, the non-movant must typically

file an affidavit or declaration, explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56.

Here, the Court concludes that both requirements for conversion are satisfied. Hoffman was on notice that the Court might resolve Medical Defendants' Motion under Rule 56 because Medical Defendants styled their Motion in the alternative for summary judgment and presented extensive extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. In addition, Hoffman filed an Opposition that points to disputed factual contentions in Medical Defendants' extra-pleading material and did not include a request for more time to conduct further discovery. Because the Court will consider documents outside of Hoffman's Complaint in resolving Medical Defendants' Motion, the Court will treat the Motion as one for summary judgment.

### 2.    Rule 56 Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in

evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

### 3. Analysis

#### a. Eighth Amendment Claims

The Eighth Amendment governs Hoffman's claims regarding denial of medical care. prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976); see also Hope v. Pelzer, 536 U.S. 730, 737 (2002); Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." De'Lonta v. Angelone, 330 F.3d 630, 633 (4th Cir. 2003) (citing Wilson v. Seiter, 501 U.S. 294, 297 (1991)); accord Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017).

To sustain a claim for denial of medical care under the Eighth Amendment, plaintiff must show that defendants' acts or omissions were done with deliberate indifference to a serious medical need. See Estelle, 429 U.S. at 106; see also Anderson, 877 F.3d at 543. Importantly, "[d]eliberate indifference is a very high standard—a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). This is so because the Constitution "is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." Id. at 695–96.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. See Farmer v. Brennan, 511 U.S. 825, 837 (1994).

Objectively, the medical condition at issue must be serious. See Hudson v. McMillian, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component is satisfied only where a prison official subjectively "knows of and disregards an excessive risk to inmate health or safety." Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) (quoting Farmer, 511 U.S. at 837); see also Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 106 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844).

Here, Medical Defendants do not dispute that Hoffman suffers from legitimate, serious conditions but aver that they have addressed his conditions. In support this assertion, Medical Defendants offer the affidavit of Dr. Asresahegn Getachew, a physician employed by Wexford to provide medical care to DPSCS inmates, together with Hoffman's verified medical records. (Getachew Aff., ECF No. 19-5; Defs.' Mot. Dismiss Summ. J. ["Defs.' Mot."] Ex. 1 ["Medical Records"], ECF No. 19-4). Medical Defendants have also provided an affidavit from Beeman, (Beeman Aff., ECF No. 19-7), and a chart entitled

"Michael Hoffman Interstitial Fibrosis Clinical Manifestations," (Defs.' Mot. Ex. 4, ECF No. 19-6).

In his affidavit, Getachew explains that on April 13, 2016, Hoffman had a chest CT scan which indicated "[f]ew scattered reticular densities in the periphery of the lungs Consider chronic interstitial lung disease such [as] UIP/DIP." (Getachew Aff. ¶ 7). Getachew describes interstitial lung disease as a medical condition which includes over 200 types of lung disorders that impact the functioning of the lungs. (Id. ¶ 8). These disorders "affect the alveoli, small airways, interstitium and surrounding capillary circulation." (Id.). Symptoms "include unexplained weight loss, breathlessness, dry cough, chest infections, clubbing of extremities, crackles on auscultation, and fatigue." (Id.). Getachew indicates that Hoffman has not been diagnosed with interstitial lung disease and that he does not exhibit any symptoms of interstitial lung disease that require treatment. (Id.). Nevertheless, Getachew avers that Hoffman will be provided a repeat chest CT scan to determine whether there has been any progression or resolution of the scattered reticular densities. (Id. ¶ 15). He also states that Hoffman will be referred to a pulmonologist for consultation. (Id.).

Medical Defendants assert that lung pain is not a symptom of interstitial lung disease.[6] (id. ¶ 9; Defs.' Mot. Ex. 3 at 23, ECF No. 19-3), and that "[t]here are other likely

---

[6] "[D]iscomfort in the chest" or "mild chest pain" are common symptoms of interstitial lung disease. Symptoms of Interstitial Lung Disease (ILD), Stanford Health Care, https://stanfordhealthcare.org/medical-conditions/chest-lungs-and-airways/interstitial-lung-disease/symptoms.html (last visited Mar. 6, 2019); Interstitial Lung Disease, Cedars-Sinai, https://www.cedars-sinai.org/health-library/diseases-and-conditions/i/interstitial-lung-disease-ild.html (last visited Mar. 6, 2019).

potential causes" of the abnormal CT scan, (Getachew Aff. ¶ 8; Defs.' Mot. Ex. 3 at 23). Medical Defendants do not explain what those other causes could be and whether further diagnostic testing is indicated to ascertain the cause of the abnormal CT scan.

Medical Defendants further represent that Hoffman's peak flow readings were "good to slightly below average," (Getachew Aff. ¶ 11; Defs.' Mot. Ex. 3 at 24), but they do not explain why the peak flow has decreased from 650 to 450 over a fifteen-month period and whether such a reduction in peak flow is clinically significant,[7] (see Getachew Aff. ¶ 11).

Given that more than a year has passed since Getachew prepared his affidavit and in light of Hoffman's self-represented status and the serious matters raised regarding his lung condition, the Court will deny Medical Defendants' Motion without prejudice and direct them to file a renewed motion with supplemental information regarding whether Hoffman has been provided the additional diagnostic testing and referral Getachew indicated would occur and the results of that testing. The Court will also direct Medical Defendants to address the apparent reduction in Hoffman's peak flow reading and whether additional diagnostic testing is required to determine the basis of Hoffman's abnormal CT scan. Additionally, Medical Defendants do not address Hoffman's claim that Wexford has a policy to delay diagnosis of cancer in inmates in order to delay treatment for the cancer.

---

[7] Peak flow monitoring is a device used "to measure how fast you can blow air out of the lungs." Cedars-Sinai, supra. As Cedars-Sinai explains: "Disease-related changes can cause the large airways in the lungs to slowly narrow. This will slow the speed of air leaving the lungs. This measurement is very important in evaluating how well or how poorly the disease is being controlled." Id.

Accordingly, the Court will direct Medical Defendants to address this allegation in their renewed motion.[8]

### b.  First Amendment Retaliation Claims

Hoffman's retaliation claim is most fairly construed as a claim that he suffered retaliation for exercising his First Amendment right to petition for the redress of grievances. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. See Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005).

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," "incarceration does not divest prisoners of all constitutional protections." Shaw v. Murphy, 532 U.S. 223, 228–29 (2001). "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). Specifically, the Fourth Circuit has

---

[8] Because the Court will require Medical Defendants to file a renewed motion for summary judgment that supplements the record in this case, the Court declines to address the allegations related to Hoffman's urinary incontinence and degenerative bone disease at this time.

held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. <u>Booker v. S. Carolina Dep't of Corr.</u>, 855 F.3d 533, 545 (4th Cir. 2017).

Here, Medical Defendants do not address Hoffman's allegations that Medical Defendants retaliated against him for filing numerous grievances against them. Accordingly, the Court will direct Medical Defendants to address these allegations in their renewed motion for summary judgment.

## III.    CONCLUSION

For the foregoing reasons, the Court will deny without prejudice Medical Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 19), subject to renew as stated herein and grant DPSCS's Motion to Dismiss (ECF No. 30). A separate Order follows.

Entered this 26th day of March, 2019.

/s/

_____
George L. Russell, III
United States District Judge