IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICHAEL J. HOFFMAN,                 *

     Plaintiff,                   *

v.                              *          Civil Action No. GLR-17-2431

ROBUSTIANO BARRERA, MD,    *
MAHBOOB ASHRAF, MD,
KRISTA BILAK, CRNP,         *
HOLLY PIERCE, CRNP,
WILLIAM BEEMAN, R.N.,       *
STACIE MAST, RN, and
WEXFORD HEALTH SOURCE, INC.,  *

     Defendants.             *
                        ***

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on Defendants Wexford Health Sources, Inc. ("Wexford"), Robustianno Barrera, M.D., Mahboob Ashraf, M.D., Krista Self (f/k/a Bilak), N.P., Holly Pierce, N.P., William Beeman, R.N., and Stacie Mast, R.N.'s (collectively, "Medical Defendants") Renewed Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 72). The Motion is ripe for review, and no hearing is needed. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant in part and deny in part the Motion, which it construes as a motion for summary judgment.

## I.   BACKGROUND

### A.   Hoffman's Allegations[1]

Plaintiff Michael J. Hoffman alleges that he has been "diagnosed with: chronic interstitial lung disease, degenerative bone disease in both knees and right foot, [and] significant abnormal areas of activity involving urinary bladder and both kidneys," but has not received adequate medical care for these conditions. (Compl. ¶ 1, ECF No. 1). Specifically, Hoffman contends that Medical Defendants ignored his complaints of pain, denied him pain medication, and refused to refer him to a provider for additional treatment. (See id. ¶¶ 11, 14–16, 21, 34–35, 50). Additionally, Hoffman asserts that Medical Defendants have denied him necessary medical treatment and made false claims against him in retaliation for the grievances he filed against them. (Id. at 26).

### B.   Procedural History

On August 24, 2017, Hoffman filed a Complaint against Medical Defendants and the Department of Public Safety and Correctional Services ("DPSCS") for failing to provide constitutionally adequate medical care for lung, bladder, knee, and foot issues and for retaliating against him for filing grievances. (ECF No. 1).

Medical Defendants filed their first Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("First Motion") on March 5, 2018. (ECF No. 19). DPSCS filed its Motion to Dismiss on April 3, 2018. (ECF No. 30). On March 26, 2019, the Court

---

[1] The Court outlines Hoffman's allegations in detail in its March 26, 2019 Memorandum Opinion. (See Mar. 26, 2019 Mem. Op. at 2–9, ECF No. 49). Those allegations are incorporated herein and referenced where applicable.

granted DPSCS' Motion to Dismiss, terminating DPSCS from suit, and denied Medical Defendants' First Motion without prejudice. (See ECF Nos. 49, 50). The Court directed Medical Defendants to file a renewed motion to supplement the evidence in the record. (Mar. 26, 2019 Mem. Op. at 20, ECF No. 49).[2] Because the Court instructed Medical Defendants to file a renewed motion, the Court deferred ruling on Hoffman's allegations related to treatment for urinary incontinence and degenerative bone disease. (Id. at 21 n.8).

On December 17, 2019, Medical Defendants (hereinafter, "Defendants") filed their Renewed Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 72). Defendants also supplemented the record with additional medical records and testimony from Dr. Getachew, which are incorporated in Hoffman's medical history below. (See ECF Nos. 72-4, 72-5). Hoffman filed an Opposition on January 8, 2020.[3] (ECF No. 74). Defendants filed a Reply on January 21, 2020. (ECF No. 75).

## C.   **Medical Records**

On January 20, 2016, Hoffman met with Krista Bilak, R.N.P. regarding Hoffman's complaints of "left shoulder pain despite medications (Tramadol, Baclofen, and Indomethacin)." (Defs.' Mot. Dismiss Alt. Summ. J. ["1st Mot."] Ex. 1 ["Medical Records

---

[2] Specifically, the Court instructed Medical Defendants to explain whether additional diagnostic testing is required to determine the basis of Hoffman's abnormal CT scan; account for the apparent reduction in Hoffman's peak flow reading; respond to Hoffman's claim that Wexford has a policy of delaying diagnosis of cancer in inmates to delay treatment; and address Hoffman's allegations that Medical Defendants retaliated against him for filing numerous grievances. (Mem. Op. at 20–21).

[3] Hoffman captioned his response as a "Motion to Dismiss Defendant's Renewed Motion Or, In the Alternative Motion for Summary Judgment." The Court construes this filing as an Opposition, and the Motion will be terminated.

1"] at 2, ECF No. 19-4). Bilak noted that Hoffman had "received a shoulder injection and physical therapy with minimal improvement." (Id.). Bilak indicated Hoffman would be referred to a provider for further treatment because he had "exhausted treatment regimens." (Id.). Hoffman received a Lidocaine joint injection in his left shoulder on February 6, 2016. (Id. at 4).

On March 14, 2016, Hoffman was evaluated by Mahboob Ashraf, M.D. for his shoulder pain. (Id. at 5). Ashraf examined Hoffman's shoulders and noted "no deformity" but "minor swelling on the left [side]." (Id.). Hoffman requested an MRI, but Ashraf explained "there is no reason to do that." (Id.). Ashraf also noted that Hoffman was already taking Tramadol and Baclofen for chronic pain. (Id.).

On March 24, 2016, Robustiano Barrera, M.D. evaluated Hoffman for his shoulder pain and weight loss. (Id. at 8). Barrera indicated that Hoffman reported pain in his shoulders that "shoots down his hands." (Id.). Barrera also noted that Hoffman received two cortisone shots that had "temporary effect." Barrera commented that Hoffman's symptoms were "compatible with impingement syndrome." (Id.). Barrera indicated Hoffman should receive Neurontin and continue taking Tramadol. (Id.). Noting Hoffman's "significant" weight loss, Barrera commented that Hoffman "has no pulmonary symptoms" but should receive a chest x-ray given Hoffman's history of chain smoking and family history of lung cancer. (Id.).

Hoffman met with Barrera again on April 7, 2016 regarding Hoffman's complaints of weight loss, chest pain, and tenderness in his cervical spine. (Id. at 11). Barrera noted that a chest x-ray "revealed a triangular opacification over the cardiac silhouette and

4

possibility of a collapsed right middle lobe." (Id.). Barrera suggested that Hoffman receive a CT scan of his chest and ordered a bone scan. (Id.).

Hoffman had a chest CT scan and bone scan on April 16, 2016. (Id. at 13–15). The CT scan indicated "[few] scattered reticular densities in the periphery of the lungs" consistent with a possible diagnosis of "chronic interstitial lung disease such [as] UIP/DIP." (Id. at 14). The results of Hoffman's bone scan were normal. (Id. at 13, 15).

On April 28, 2016, Krista Bilak, R.N.P. met with Hoffman to explain the results of his diagnostic testing. (Id. at 16). Bilak noted that Hoffman's CT scan indicated "[c]hronic interstitial lung disease" and his bone scan evidenced "[n]o definite evidence of osseous metastic disease." (Id.). Bilak noted that Hoffman continued to complain of bone pain, and indicated she would order Vitamin D. (Id.).

On May 27, 2016, Hoffman had another visit with Bilak, during which Hoffman complained of continued "bone pain in [his] ribs." (Id. at 18). Bilak indicated that Hoffman was "specifically . . . asking for a PET scan and [Tylenol #3] or tramadol for bone pain" and for a "second opinion" on the results of his diagnostic tests. (Id.). Bilak indicated she would refer Hoffman to a doctor on site. (Id.).

On June 6, 2016, Hoffman had a provider visit with Mahboob Ashraf, M.D. (Id. at 20). Ashraf noted that Hoffman was "clinically clear" with "no sign of distress" or wheezing. (Id.). Ashraf advised Hoffman that he should avoid working out or playing sports "as it may affect his lung[s]" or cause shortness of breath. (Id.). Ashraf also prescribed Hoffman Tylenol #3 for his continued rib pain. (Id.).

Hoffman attended his chronic care visit with Ashraf on July 7, 2016. (Id. at 22). During the visit, Hoffman complained of lower back pain and told Ashraf that he wanted Tylenol #3 because "NSAIDs do[] not work for him." (Id.). Ashraf continued Hoffman's Tylenol #3 prescription until August 6, 2017. (Id. at 24).

On August 9, 2016, Hoffman saw Holly Pierce, C.R.N.P. for a health assessment. (Id. at 25). Pierce noted Hoffman had "chronic back and joint pain." (Id. at 26). Hoffman saw Pierce again on August 30, 2016, at which time Pierce indicated that Hoffman "reports he elected to stop all medications" and "therefore feels he no longer needs chronic care management." (Id. at 28). After Pierce educated Hoffman "on the importance of medication compliance and the purpose of chronic care," Hoffman agreed to resume his current medication regimen as prescribed. (Id.).

On September 2, 2016, Hoffman received a chest x-ray, which demonstrated "clear lung fields," "[n]o pneumothorax or pleural effusions," and "[m]ediastinal structures and cardiac silhouette . . . within normal limits." (Id. at 30). On September 26, 2016, Hoffman attended a chronic care visit with Pierce. (Id. at 31). Pierce's notes indicate that Hoffman "demand[ed]" to know the results of his chest x-ray, which had been ordered approximately one month prior. (Id.). Pierce informed Hoffman that the results were not back at that time and Hoffman would be scheduled for a follow-up appointment when his results were received. (Id.).

Hoffman attended a provider visit with Pierce on October 14, 2016. (Id. at 37). Hoffman complained of chest pain that began two or three months prior and said he was "fearful the pain may be cancer related." (Id.). Pierce reviewed Hoffman's chest x-ray,

6

bone scan, CT scan, and laboratory results with him. (Id.). According to Pierce's notes, Hoffman then became angry, stating, "I am in pain[,] Holly. Give me something now!" After Pierce advised that Hoffman's symptoms could be associated with anxiety or depression, Hoffman replied that he wanted to see a doctor and said, "I am writing you up. I will get what I want." (Id.). Pierce prescribed Hoffman Tylenol for "breakthrough pain." (Id.). According to Hoffman, on October 17, 2016, Pierce filed a complaint falsely stating that Hoffman threatened her during the October 14, 2016 provider visit. (Compl. ¶¶ 30, 31). As a result of Pierce's complaint, Hoffman was placed on administrative segregation for forty days. (Id.).

Hoffman attended a provider visit with Bilak on November 17, 2016. (Medical Records 1 at 39). During the visit, Hoffman told Bilak, "I have been diagnosed with COPD and you are wrong and need to do the appropriate tests on me." (Id.). Hoffman also told Bilak that he was "in extreme pain and cannot breathe." (Id.). Bilak noted that Hoffman's vital signs and "his ability to yell" during the provider visit were "not consistent with his described level of pain." (Id.).

Hoffman met with Bilak again on December 12, 2016. (Id. at 41). Hoffman reported that he was experiencing "severe lung pain" and believed his condition was "not being managed properly" by providers. (Id.). After Bilak provided Hoffman with educational materials about COPD, Hoffman "became loud and agitated" and stated that "medical does not know how to treat his condition." (Id.).

On December 21, 2016, Hoffman attended a chronic care visit with Bilak. (Id. at 43). Bilak noted that although Hoffman reported "severe" pleuritic pain that began five

months prior, Hoffman's diagnostic testing suggested there was "[n]o physical reason for [Hoffman's] report of pain." (Id.). Bilak continued Hoffman's prescription for Tylenol #3 until February 14, 2017. (Id.). Bilak also referred Hoffman to a provider for further evaluation. (Id. at 45).

On January 10, 2017, Hoffman was evaluated by Mulugeta B. Akal, M.D. on referral for Hoffman's complaints of "lung pain." (Id. at 47). Although Hoffman told Akal, "my lungs are killing me," Akal noted that Hoffman had "[n]o pain [when] breathing or coughing." (Id.). Akal observed that Hoffman's "[p]ain originates from the mid thoracic region and runs down the ribs." (Id.). Akal indicated that the results of Hoffman's CT scan of the chest and lungs, bone scan, and recent chest x-ray did not indicate lung disease or cancer. (Id. at 48). Akal also noted that Hoffman did not appear to have any symptoms of COPD. (Id.). Akal reassured Hoffman that his pain was musculoskeletal and did not originate from inside the lungs. (Id.). Akal also advised Hoffman to use Lidocaine cream for relief and to submit a sick call slip if the pain continues. (Id.).

At his January 30, 2017 provider visit, Hoffman told Ashraf that the results of his CT scan indicated he had lung disease. (Id. at 51). Ashraf observed that Hoffman had "no sign of wheezing or shortness of breath" and no recent asthma attacks. (Id.). Ashraf also noted that Akal had recently evaluated Hoffman's diagnostic tests and prescribed Lidocaine for Hoffman's pain. (Id.). Ashraf discontinued Hoffman's prescription for Tylenol #3 and instead prescribed him indomethacin and ibuprofen. (Id.).

On April 4, 2017, Hoffman once again complained of "lung pain" during a visit with Bilak. (Id. at 56). Specifically, Hoffman indicated that his left side hurts when he takes a

8

deep breath. (Id.). However, Bilak noted that Hoffman's lungs were "clear to auscultation and percussion." (Id.). Bilak advised Hoffman to follow up if his condition worsened. (Id. at 57).

On April 20, 2017, Hoffman received a chest x-ray, which once again indicated "clear lung fields," "[n]o pneumothorax or pleural effusions," "[m]ediastinal structures and cardiac silhouette . . . within normal limits," and "[n]o gross osseous abnormality." (Id. at 58). The report also concluded that Hoffman had "[n]o acute cardiopulmonary disease." (Id.).

Hoffman attended a provider visit with Bilak on April 28, 2017. (Id. at 59). During the visit, Bilak educated Hoffman on his recent lab and x-ray results. (Id.). Bilak also noted she would prescribe antibiotics to address Hoffman's complaints of increased urination and dysuria. (Id.).

Hoffman was evaluated by Bilak again on May 4, 2017 in response to Hoffman's sick call slip stating he was worried about having non-hodgkin's lymphoma bone cancer. (Id. at 61). Bilak once again reviewed the results of Hoffman's diagnostic tests with him and educated him about cancer. (Id.).

On July 5, 2017, Hoffman was evaluated by Stacie Mast, R.N. for complaints of possible lung disease and painful and uncontrolled urination. (Id. at 63). Hoffman informed Mast that the results of his CT scan indicated "possible lung disease" and that he was having "[t]rouble with urination and voiding." (Id.). Hoffman also said that he had told his providers about these issues but "feels nothing is being done about it." (Id.). Mast referred Hoffman to a provider for follow-up on these issues. (Id.).

After continued reports of lung pain, Hoffman was evaluated by Mast again on July 29, 2017. (Id. at 65). During this visit, Hoffman told Mast "he has lung disease and would like to have testing done to see if there is a cure" and reiterated that "he was told he has interstitial lung disease." (Id.). In her report, Mast noted that Hoffman told her "a while back" that he had "end stage" lung disease, which Mast noted has "no cure . . . other [than] a lung transplant." (Id.). Mast referred Hoffman to a provider "for explanation of lung issues." (Id.).

On August 11, 2017, Hoffman was evaluated by Pierce for complaints of increased urination. (Id. at 67). Hoffman explained that he "voids 20–30 times per day" and his symptoms did not improve with antibiotics. (Id.). Pierce ordered blood and urine testing and referred Hoffman to a provider for a digital rectal exam and follow-up on his lab results. (Id. at 68). Ashraf performed a digital rectal exam on Hoffman on August 17, 2017. (Id. at 69). Ashraf concluded that Hoffman's prostate was not enlarged and the rectal examination was otherwise normal. (Id.).

On August 31, 2017, Hoffman was evaluated by Pierce for a routine physical. (Id. at 71). During the visit, Hoffman once again reported ongoing lung pain. (Id.). Hoffman also reported pain in his left knee and requested a knee brace. (Id. at 72). Pierce placed an order for muscle rub and a knee sleeve and instructed Hoffman to use ice for twenty minutes to alleviate his knee discomfort. (Id.).

Hoffman met with Pierce again on November 9, 2017 for a provider visit. (Id. at 74). Hoffman reported joint pain, "bilateral finger and wrist stiffness with tenderness," right shoulder pain, and lower back pain. (Id.). Hoffman also told Pierce "he does not

10

understand why he is always in so much pain." (Id.). Pierce ordered a lab study for rheumatoid arthritis to address Hoffman's joint pain. (Id. at 75).

On November 19, 2017, Hoffman was evaluated by Mast for concerns about a recent cough. (Id. at 76). Hoffman indicated he has a cough up to fifteen times a day. (Id.). Mast observed that Hoffman's lungs were clear and there was "no productive cough noted." (Id.). Mast also advised Hoffman on the side effects of taking Lisinopril.[4] (Id.). Mast referred Hoffman to a provider for "eval on medication and associated cough." (Id.).

On November 27, 2017, Hoffman met with Pierce for a chronic care visit. (Id. at 78). Hoffman reported that he is compliant with Lisinopril but "feels it is causing a nagging cough[]" that "began 3–4 weeks ago." (Id.). As a result of Hoffman's adverse side effects, Pierce advised him to discontinue Lisinopril and receive frequent blood pressure checks. (Id. at 79).[5]

On January 24, 2018, Hoffman was evaluated by Ashraf in response to Hoffman's sick call slip stating that he believed he had cancer. (Id. at 81). Ashraf noted that Hoffman

---

[4] Lisinopril, a high blood pressure medication, may cause coughing as a side effect. See https://medlineplus.gov/druginfo/meds/a692051.html (last visited Sept. 10, 2020).

[5] In response to the Court's request for additional information about Hoffman's apparent reduction in peak flow between August 2016 and November 2017, Getachew states that Hoffman's peak flow readings from August 9, 2016 to June 18, 2019 indicate a range from 400 to 650, including readings of 550 on October 1, 2018 and June 18, 2019. (Defs.' Renewed Mot. Dismiss Alt. Summ. J. ["Renewed Mot."] Ex. 2 ["Dec. 16, 2019 Getachew Aff."] ¶ 7, ECF No. 72-5). The chronological readings indicate Hoffman tested in the 650 "personal best" zone in eight out of thirteen readings during this time period. (Id.). Additionally, Getachew notes that technique in administration of the test can cause differing results. (Id.). As such, Getachew opines that there is no clinical significance in the difference in Hoffman's peak flow reading of 650 in August 2016 and 450 in November 2017, particularly given the absence of other respiratory symptoms. (Id.).

was clinically stable with clear lungs and no chest pain, palpitations, cough, or weight loss. (Id.). Ashraf reviewed Hoffman's CT scan from April 2016, commenting that it "shows he has interstitial lung disease." (Id.). Ashraf referred Hoffman to a provider for two chest x-rays in order to compare the results to Hoffman's previous scans. (Id. at 81, 83).

Hoffman received a chest x-ray on January 29, 2018. (Id. at 84). Like his previous scans, the results demonstrated "clear lung fields," "[n]o pneumothorax or pleural effusions," "[m]ediastinal structures and cardiac silhouette . . . within normal limits," and "[n]o gross osseous abnormality," which confirmed that Hoffman had "[n]o acute cardiopulmonary disease." (Id.).

On February 6, 2018, Hoffman met with Pierce for a provider visit. (Defs.' Renewed Mot. Dismiss Alt. Summ. J. ["Renewed Mot."] Ex. 1 ["Medical Records 2"] at 6, ECF No. 72-4). Hoffman complained of lung pain and pain in his left side when taking a deep breath. (Id.). Hoffman requested an MRI, lung biopsy, and pain medication for his symptoms. (Id.). Pierce referred Hoffman to a provider for evaluation and treatment of his lung pain. (Id. at 7).

On March 7, 2018, Pierce requested a case review to assess Hoffman's complaint of ongoing lung pain. (Id. at 8). Pierce also recommended a repeat CT scan and placed a request for a pulmonary consultation. (Id.). Two days later, on March 9, 2018, Mast evaluated Hoffman for "chronic issues with his lungs and throat." (Id. at 9). Although Hoffman complained of "issues with his lung[s] and chest" and "continued pain issues," Mast noted that Hoffman's lungs sounded clear and there was no wheezing. (Id.). Mast noted that Hoffman had recently seen Pierce, who wrote recommendations for a chest CT

scan and pulmonary function test ("PFT").[6] (Id.). Mast gave Hoffman "some [M]otrin out of stock" to treat his "mild discomfort" and advised Hoffman to buy cough drops from the commissary, drink fluids, and rest. (Id.). Mast also indicated she would continue the current plan of treatment and wait for a provider to recommend additional tests. (Id.).

Pierce again evaluated Hoffman for lung pain on April 15, 2018. (Id. at 11). Pierce noted that Hoffman's chest CT scan and pulmonary function test were still pending and indicated that Hoffman's case would be reviewed by Dr. Getachew. (Id.). Pierce also recommended Albuterol and requested a pulmonary consultation. (Id. at 11–12).

Hoffman underwent a chest CT scan on April 20, 2018. (Id. at 13). The results of the scan indicated "scattered fine reticular densities in the upper and lower lobes" that were "relatively unchanged" from the prior CT scan on April 13, 2016. (Id.). Additionally, the scan showed "scattered nonspecific axillary and mediastinal lymph nodes" that were unchanged from the prior CT and that there was "no suspicious spiculated pulmonary nodule." (Id.). The scan also revealed "mild degenerative changes in the thoracolumbar spine." (Id.).

On April 28, 2018, Hoffman met with Regina Lease, R.N. to request the results of his lab tests. (Id. at 14). Specifically, Hoffman told Lease, "I need these lab tests to figure out what is wrong with me, nobody believes me." (Id.). Lease observed that Hoffman seemed to be hyperventilating. (Id.). Lease noted that Hoffman's breathing become non-labored after she instructed him to breathe in through his nose and out through his mouth.

---

[6] A PFT is a noninvasive test that shows how well the lungs are working. (Dec. 16, 2019 Getachew Aff. ¶ 5).

(Id.). Hoffman's lungs were clear. (Id.). Hoffman requested a number of lab tests, but Lease responded she could not order those labs on her own; instead, Lease referred Hoffman to a provider to discuss his requests. (Id.). Lease recommended deep breathing exercises to help alleviate Hoffman's pain and anxiety. (Id.).

Hoffman received a PFT on May 23, 2018. (Id. at 16). Hoffman's PFT indicated he "had a suboptimal spirometric maneuver," which "suggest[ed] a moderately severe restrictive pulmonary impairment." The PFT also indicated, however, that there was "no evidence for airway obstruction" and Hoffman had "normal diffusing capacity," which "argue[] against a significant underlying interstitial process." (Id.). According to Dr. Getachew, this result means that Hoffman "possibly" did not perform well on the PFT "intentionally." (Renewed Mot. Ex. 2 ["Dec. 16, 2019 Getachew Aff."] ¶ 6, ECF No. 72-5).

Hoffman attended a chronic care visit with Pierce on May 31, 2018. (Medical Records 2 at 17). During the visit, Hoffman reported that his complaints of lung pain were "unchanged" and that it hurt when taking a deep breath. (Id.). Hoffman stated that his prescriptions for QVar and Albuterol were not improving his lung pain, but he wanted to continue taking them because it was "getting hot out." (Id.). According to Pierce's notes, Hoffman asked her about costochondritis, admitting, "I know I don't have a lung disease but I do have this." (Id.). Hoffman also reported "lower back pain with shooting pain down the bilateral legs" as well as pain in his knees and upper back. (Id. at 18). Pierce recommended that Hoffman complete "[s]tretching exercises before and after working" and use ice to treat joint pain. (Id.). The day of Hoffman's chronic care visit, Dr. Getachew

approved a 120-day prescription for Duloxetine to treat Hoffman's chronic pain. (Id. at 21).

On June 28, 2018, pursuant to previous referrals from his providers, Hoffman was evaluated by pulmonologist Pejman Danal, M.D. (Id. at 23). Danal concluded that the cause of Hoffman's lung pain was unclear. (Id.). Danal speculated that it "could be hypersensitivity pneumonitis" but Hoffman would "likely need [an] open lung biopsy to confirm" that diagnosis. (Id.). Alternatively, Danal suggested Hoffman could have "COPD[-]related pulmonary fibrosis" given Hoffman's history of smoking. (Id.). Danal referred Hoffman to a thoracic surgeon for additional testing and recommended "pulmonary function testing, repeat chest CT[,] and possibly surgical lung biopsy." (Id.). A note in Hoffman's medical records indicates that Hoffman's providers faxed the results of his chest CT scan and PFT to Danal on July 23, 2018. (Id. at 25).

Hoffman was sent out for his appointment with a thoracic surgeon on August 31, 2018, but he fell while exiting the prison van and had to be diverted to the emergency room. (Dec. 16, 2019 Getachew Aff. ¶ 6). While there, Hoffman was evaluated for lower back pain and received x-rays, which confirmed he had "no fractures or subluxation." (Medical Records 2 at 26).

On September 4, 2018, Hoffman submitted a sick call slip indicating he had "lost 30 pounds in a month, without trying." (Id. at 28). Hoffman also stated he had "pain in left hip going down left leg" and that he was "losing function of his left leg." (Id.). After evaluating Hoffman on September 6, 2018, William Beeman, R.N. referred Hoffman to a provider to address his complaints of weight loss and leg pain. (Id. at 29).

15

On September 12, 2018, Hoffman met with Pierce for a chronic care visit. (Id. at 32). Hoffman complained that "he is always cold and . . . losing weight." (Id.). Pierce noted that Hoffman's weight was "177 down from previous 180." (Id.). Hoffman also reported "lower back pain with sciatica" because he "fell of his bunk [and] then later fell out of [the prison] van." (Id. at 33). Hoffman informed Pierce that the hospital told him he should be prescribed Tylenol #3. (Id.). Pierce continued Hoffman on Tylenol and instructed him to apply a warm compress and do lower back exercises to alleviate his lower back pain. (Id. at 34–35).

On October 1, 2018, Hoffman met with Pierce for his periodic physical exam. (Id. at 37). Pierce noted Hoffman's complaints of chronic lung pain and that Hoffman reported weight loss between forty and fifty pounds. (Id.). At this visit, Pierce informed Hoffman that his visit with the thoracic surgeon would be rescheduled. (Id.). Pierce did not perform a physical examination because Hoffman reported suicidal thoughts and asked to be transferred to the mental health facility. (Id.).

Hoffman submitted a sick call slip on November 11, 2018, once again reporting pain in his chest and lungs and indicating he lost forty pounds in three months. (Id. at 40). On November 19, 2018, Hoffman submitted another sick call slip stating that he had severe pain in his chest, lungs, and upper back, and was continuing to lose weight rapidly. (Id. at 41). The following day, Hoffman submitted a third sick call slip, asking, "How many sick calls do I have to put in before I see somebody[?]" and indicating he needed "to see a lung surgeon to get a lung biopsy." (Id. at 42). Hoffman submitted a similar sick call slip on

December 1, 2018, once again reporting chronic pain in his chest, lungs, and upper back, as well as weight loss from "203 pound[s] in September to 150 pounds today." (Id. at 43).

On December 9, 2018, Hoffman met with Kimberlie Ventura, R.N. regarding his health concerns. (Id. at 44). Hoffman asked Ventura when he would receive a lung biopsy. (Id.). Ventura indicated that she would refer Hoffman to the provider for follow-up about the plans to perform a lung biopsy. (Id.). Hoffman did not mention his concerns about his unexplained weight loss or joint pain during this visit. (See id.).

Hoffman received another chest CT scan on December 21, 2018. (Id. at 48). The scan indicated "[m]inimal fibrotic changes . . . in the periphery of both lungs," "some atelectatic changes," "[n]o pleural effusion," and "[n]o rib injury." (Id.). The report concluded that Hoffman's results were similar to his prior CT scan on April 20, 2018 and he had "[n]o acute abnormality." (Id.).[7]

On February 1, 2019, Hoffman was evaluated by thoracic surgeon Whit Burrows, M.D. from the University of Maryland Medical System ("UMMS"). (Id. at 49). Hoffman told Burrows that "he can do some physical activity, such as a flight of stairs, but his bigger complaint is pain with breathing, to the point of not being able to breathe without pain while lying down." (Id.). Hoffman also complained of "fatigue, body wide joint pains, sweats for the past 2 years, and 50 pounds weight loss over 3 months starting in August."

---

[7] In response to the Court's request for additional information about abnormalities in Hoffman's CT scan, Dr. Getachew avers that any abnormalities in Hoffman's CT scans could be attributed to "[a]lternate potential causes" such as environmental pollutants, gastroesophageal reflux disease, Hoffman's history of smoking and drug use, hypersensitivity pneumonitis, pulmonary fibrosis related to chronic obstructive pulmonary disease, and autoimmune disease. (Dec. 16, 2019 Getachew Aff. ¶ 6).

(Id.). Hoffman did not mention issues with urination during this visit. (See id. at 51). After reviewing Hoffman's diagnostic tests, Burrows noted that although the results of Hoffman's chest CT scans showed "subtle changes mainly in the periphery of the lungs," the scans were largely "unchanged" between 2016 and 2018. (Id. at 51, 52). Burrows indicated that while a "lung biopsy was possible, the areas to target with [the biopsy] are quite small." (Id. at 52). Burrows concluded that Hoffman's symptoms of Hoffman's symptoms "of pain with breathing, fatigue and body arthralgias[8]" were indicative of "possibly a rheumatological phenomenon." (Id.). Noting that Hoffman's "primary complaint" was "pain with breathing and other constitutional symptoms," Burrows stated that he would refer Hoffman to a pulmonologist at UMMS "with an eye towards blood serologies which may be of more diagnostic value." (Id.). Burrows noted he would see Hoffman again only if needed. (Id.).

On March 11, 2019, Hoffman attended a chronic care visit with Dr. Getachew. (Id. at 53). Getachew indicated that Hoffman had been evaluated at UMMS in February but that the report was not available in Hoffman's chart. (Id.). Getachew indicated he would reschedule Hoffman in two weeks in order to review the consultation report from the UMMS doctor. (Id.). Hoffman also complained of chronic shoulder, neck, and back pain, but indicated that he experiences relief from taking Naproxen. (Id. at 55). As a result,

---

[8] Arthralgias describes joint stiffness and symptoms include back pain, loss of spine flexibility, inflammation of the eyes, lungs, and heart valves, and swelling and stiffness of the spine and sacroiliac joints. See https://www.hopkinsmedicine.org/health/conditions-and-diseases/arthralgia (last visited Aug. 7, 2020).

Getachew instructed Hoffman on the adverse side effects of Naproxen and gave him a one-month supply. (Id.).

Getachew met with Hoffman again on April 1, 2019. (Id. at 56). Hoffman again complained of "dyspnea on exertion, dry cough, and chest pain." (Id.). Getachew noted that the cause of Hoffman's "interstitial lung disease" was unclear, but could be the result of Hoffman's work as a painter and plumber or history of smoking and illicit drug use. (Id. at 57). Getachew noted that Hoffman "was referred to [UMMS] for lung biopsy and consideration of treatment" but he "was not able to locate the record" of Hoffman's evaluation. (Id.). Nonetheless, Getachew referred Hoffman to the UMMS pulmonary clinic for a lung biopsy.[9] (Id.).

On April 24, 2019, Hoffman was evaluated by Robin Shively, R.N. for complaints about his medication. (Id. at 59). Hoffman indicated that he was seen by a provider on April 1, 2019 and "was prescribed Elavil and Baclofen for pain." (Id.). After reviewing the note from Hoffman's previous visit, Shively explained that Hoffman was only prescribed Naproxen for pain. (Id.). Shively reported that Hoffman was "not happy about not receiving [the requested] pain medication." (Id.).

---

[9] Although Hoffman's medical record states that he was "referred to [UMMS] for lung biopsy," (Medical Records 2 at 57), Hoffman was never actually scheduled to receive a lung biopsy; rather, pulmonologist Dr. Danal referred Hoffman to a thoracic surgeon in order to evaluate whether a biopsy would be medically required. (Id. at 23). After evaluating Hoffman in February 2019, thoracic surgeon Dr. Burrows indicated that a lung biopsy was "possible" but that blood tests would have more diagnostic value given Hoffman's symptoms. (Id. at 52). Thus, although Getachew referred Hoffman for a lung biopsy in April 2019, a lung biopsy was not indicated for Hoffman's condition at that time.

Hoffman submitted a sick call slip on April 27, 2019 complaining that he was "constantly urinating" and would like to have his prostate and Vitamin D levels checked. (Id. at 60). Hoffman submitted another sick call slip on May 2, 2019 requesting the same. (Id. at 61).

On May 9, 2019, Hoffman was evaluated by John Glenn Williams, M.D. in the pulmonary and critical care department of UMMS. (Id. at 62). Williams noted that after Hoffman's February 2019 consultation with the thoracic surgeon, a "biopsy was deferred in lieu of further pulmonary evaluation and work-up for ILD." (Id.). Williams noted there was a "[r]estrictive ventilatory defect" on Hoffman's PFT and his CT scans demonstrated "findings of stable ILD," but his symptoms were otherwise "stable." (Id.). Williams also observed that the cause of Hoffman's condition was uncertain, but Hoffman had a "significant 50–75 pack [per] year smoking history and 24[-]year history of huffing paint." (Id. at 64). Williams recommended a "[r]epeat PFT to assess for progression" and "further work-up for ILD in the setting of diffuse body pain concerning a rheumatologic disorder." (Id.). Additionally, Williams recommended "temporary treatment with NSAID (naproxen or ibuprofen) until further rheumatologic evaluation" in light of Hoffman's "diffuse muscle aches and pain." (Id.). In all, Williams concluded it was "possible that [Hoffman] is developing a rheumatologic disorder that is emerging to clinical visibility after the fibrotic disease." (Id. at 65).

Hoffman submitted sick call slips on May 10, 2019 and May 15, 2019 requesting a blood test to determine why he "strain[s] to start [urinating], urin[ates] often, and [his] flow

is weak and slow." (Id. at 67, 68). Hoffman was referred to a provider for this issue on May 12, 2019. (Id. at 68).

On June 18, 2019, Hoffman attended a chronic care visit with Pierce. (Id. at 69). Hoffman once again reported ongoing shortness of breath and fatigue. (Id.). Hoffman also noted "constant urination" and requested tests for his blood and Vitamin D levels. (Id.). Hoffman told Pierce that "he was diagnosed with [degenerative joint disorder] in both knees and right foot" and had "bone spurs in between [the] vertebras in [his] back" and therefore needed to see a specialist. (Id.). Pierce also noted that Hoffman had submitted two sick call slips "reporting that medical staff are refusing to treat his pain properly." (Id.). Pierce ordered a blood test and urine sample, requested an x-ray for Hoffman's chronic pain, and instructed him to take Vitamin D as prescribed. (Id. at 71, 72).

Hoffman was evaluated by Brenda Reese, R.N. on August 8, 2019. (Id. at 73). Hoffman told Reese that he had not had a chronic care visit and needed some medications filled. (Id.). Hoffman stated he had "an infection on [his] penis" that hurt during urination. (Id.). Hoffman also requested "an MRI of his leg and back." (Id.). Reese referred Hoffman to the "medication nurse for continued medication administration" and to a male provider for Hoffman's "infected penis." (Id.).

On August 23, 2019, Bernard P. McQuillan, M.D. evaluated Hoffman for "recurrent edema" and his complaints of an infection on his penis. (Id. at 74). McQuillan observed that Hoffman had a "[c]ircumscribed circular raised erythematous rath on the glans penis"

with "no drainage or urethral discharge." (Id.). McQuillan ordered a rapid plasma regain serology test.[10] (Id.).

Hoffman met with McQuillan again on September 11, 2019 for a follow-up visit. (Id. at 75). McQuillan noted that Hoffman's syphilis and HIV screenings were negative. (Id.). McQuillan observed that the lesion on Hoffman's penis was "strongly suspicious of Bowen's disease."[11] (Id.). McQuillan indicated that a "[d]ermatologic consultation is pending for a biopsy and possible treatment of [Hoffman's] suspected carcinoma in situ." (Id.). Hoffman did not complain of urgent or frequent urination during this visit, and "declined digital rectal examination" because it would "be done by urology at the time of his consultation." (Id. at 75, 76).

Hoffman underwent a PFT on September 26, 2019. (Id. at 77). His results indicated that there was "[n]o obstructive ventilatory defect" or "restrictive defect" in his lungs, his flow volume loops showed no abnormality, and his "Diffusing Capacity" was normal. (Id.). Overall, Hoffman's PFT was "within normal limits." (Id.).

On October 7, 2019, Hoffman was evaluated by McQuillan on sick call. (Id. at 81). McQuillan noted that Hoffman's "pulmonary function studies [were] recently completed

---

[10] The rapid plasma reagin ("RPR") test is a blood test that detects antibodies to syphilis. See https://www.urmc.rochester.edu/encyclopedia/content.aspx?contenttypeid=167&contentid=rapid_plasma_reagin_syphilis (last visited Sept. 11, 2020).

[11] Bowen's disease, also called "squamous cell carcinoma in situ," is a form of skin cancer that typically appears as a red, scaly patch on the skin. See https://www.aocd.org/page/BowensDisease (last visited Sept. 11, 2020).

but unreported to-date" and his "Bowens disease of the glans penis [was] irritated but no drainage noted." (Id.). McQuillan ordered several blood tests. (Id.).

On October 19, 2019, Hoffman was evaluated by Janette Clark, N.P. on sick call. (Id. at 83). Hoffman reported "pain in chest, lower lungs, bilateral knees[,] and on penis from possible skin cancer." (Id.). Clark noted that Hoffman's "[c]hest pain in lower lungs is not new" but he was "being followed by pulmonary med at UMMS" and had been referred to rheumatology. (Id.). Clark indicated that Hoffman's referral to rheumatology was approved on June 13, 2019 and that she would send an "inquiry to off[-]site scheduler regarding appointment." (Id.).[12] Clark also noted that the interpretation of the results from Hoffman's September 26, 2019 PFT were not available, but she had sent a request to the off site scheduler to obtain them. (Id.). Additionally, Clark indicated that Hoffman's x-ray from July 9, 2019 indicated "mild [degenerative joint disorder]" in Hoffman's spine. (Id.). Clark instructed Hoffman to follow up if his conditioned worsened. (Id. at 85).

On November 15, 2019, Hoffman was evaluated by Amelia Hoenicka, R.N. on sick call. (Id. at 86). Hoenicka noted that requests had been submitted for consultations with dermatology and rheumatology. (Id.). Hoffman asked Hoenicka "when he was going to be seen," but she explained "that scheduling dates are unknown." (Id.). Because Hoffman also requested medication and a knee brace, Hoenicka scheduled a follow-up with a provider. (Id.).

---

[12] According to Hoffman, he had still not seen a rheumatologist as of January 8, 2020. (Pl.'s Mot. Dismiss Defs.' Renewed Mot. Alt. Mot. Summ. J. ["Pl.'s Opp'n"] at 7, ECF No. 74).

## II.    DISCUSSION

**A.    <u>Conversion</u>**

Defendants' Motion is styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. See <u>Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.</u>, 788 F.Supp.2d 431, 436–37 (D.Md. 2011), <u>aff'd</u>, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" <u>Wells-Bey v. Kopp</u>, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See <u>Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.</u>, 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice

that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d).

"The Fourth Circuit places 'great weight' on the affidavit requirement." Nautilus Ins. Co. v. REMAC Am., Inc., 956 F.Supp.2d 674, 683 (D.Md. 2013) (quoting Evans, 80 F.3d at 961). However, non-compliance may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary." Harrods, 302 F.3d at 244. Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive." Id. (quoting 10B Wright, Miller & Kane, Federal Practice & Procedure § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

Nonetheless, a Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 953 (4th Cir. 1995)).

In this case, pursuant to the dictates of Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), the Court notified Hoffman of his right to respond to Defendants' Motion and advised that he may file affidavits, declarations, and exhibits along with his response. (See ECF No. 73). Although Hoffman filed exhibits with his Opposition, he did not submit a Rule 56(d) affidavit expressing a need for discovery. Instead, Hoffman asks the Court to "subpoena" Defendants to "answer important questions under oath" about their professional qualifications and prior employment. (Pl.'s Mot. Dismiss Defs.' Renewed Mot. Alt. Mot. Summ. J. ["Pl.'s Opp'n"] at 23–24, ECF No. 74).[13] At bottom, this request is insufficient to show that conversion of Defendants' Motion is inappropriate. Accordingly, the Court will construe Defendants' Motion as one for summary judgment and will consider documents outside of Hoffman's Complaint.

**B.    <u>Summary Judgment</u>**

---

[13] Hoffman filed an Affidavit on March 30, 2020 that does not pertain to his request for discovery, and instead restates his request for relief. (ECF No. 76).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)).

Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

**C.   Analysis**

**1.    Eighth Amendment**

Hoffman alleges that Defendants have denied him adequate medical care for his lung condition, urinary incontinence, and degenerative bone disease in violation of the Eighth Amendment of the United States Constitution. The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976); see Estelle v. Gamble, 429 U.S. 97, 102 (1976); Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016). To sustain a claim for denial of medical care under the Eighth Amendment, the plaintiff must show that defendants' acts or omissions were done with deliberate indifference to a serious medical need. See Estelle, 429 U.S. at 106; see also Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017).

Deliberate indifference to a serious medical need is defined as "treatment [that is] so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). Accordingly, "[d]eliberate indifference is a very high standard—a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999).

Importantly, disagreements between medical staff and an inmate over the necessity for or extent of medical treatment do not rise to a constitutional injury and will not make out a cause of action under § 1983. See Estelle, 429 U.S. 105–06. Moreover, the mere failure to treat all medical problems to a prisoner's satisfaction is insufficient to support a claim of deliberate indifference. Peterson v. Davis, 551 F.Supp. 137, 146 (D.Md. 1982), aff'd, 729 F.2d 1453 (4th Cir. 1984).

### 1.    Lung Condition

Hoffman contends that Defendants have been deliberately indifferent to his medical needs because they have refused to provide an "MRI, lung biopsy[,] and PET scan" despite his continued pain from ILD and his belief that he has "lung cancer or tumors in his lungs." (Compl. at 26–27).

As a preliminary matter, Hoffman's insistence that he has ILD or lung cancer is not supported by evidence in the record. Hoffman received a chest x-ray and CT scan in early 2016 after he reported significant weight loss to his providers.[14] Although the technician interpreting the CT scan indicated that Hoffman's providers should "[c]onsider chronic

---

[14] Although Hoffman had lost weight as of March 2016, he has since gained it back. (1st Mot. Ex. 2 ["Mar. 5, 2018 Getachew Aff."] ¶ 11, ECF No. 19-5).

interstitial lung disease," Hoffman was not diagnosed with ILD at that time. (1st Mot. Ex. 2 ["Mar. 5, 2018 Getachew Aff."] ¶¶ 7–8, ECF No. 19-5). Rather, "ILD was merely a suggested consideration." (Id. ¶ 8). Yet after the CT scan, Hoffman repeatedly told his providers that he had been diagnosed with ILD or COPD and expressed his fears that he had lung cancer, even though Hoffman's complaints of severe pain were not supported by or consistent with his physical symptoms. Nonetheless, upon Hoffman's continued complaints, Defendants performed additional diagnostic tests and referred Hoffman to an outside pulmonologist and thoracic surgeon for evaluation. These physicians confirmed that Hoffman had no signs of lung cancer, lung disease, or COPD, concluded that Hoffman's pain was musculoskeletal, and referred him to another provider to assess for a possible rheumatic condition. Because Hoffman does not have lung disease or lung cancer, an MRI, lung biopsy, and PET scan are not medically necessary. (See id. ¶ 11). Prison healthcare providers are not constitutionally required to perform diagnostic testing upon a prisoner's every request, nor are they required to provide medical treatment for a condition that a prisoner does not have. As such, Defendants were not deliberately indifferent by failing to provide Hoffman with further diagnostic testing.

Relatedly, Hoffman contends that Defendants have a policy of not providing diagnostic tests that could catch early stage cancer, such as MRIs or PET scans, and that they deliberately wait until a patient is diagnosed with end stage cancer before providing treatment. (Compl. ¶ 28, 29). In support of this assertion, Hoffman simply states that he has "never met a[n] inmate with early stage cancer who has received treatment for said cancer." (Id. at 28). For their part, Defendants respond that Wexford has "no such policy"

of delaying diagnoses of cancer in inmates in order to delay treatment. (Dec. 16, 2019 Getachew Aff. ¶ 10). And in Hoffman's case, there is no indication that Defendants avoided providing an MRI or PET scan to delay Hoffman's treatment or diagnosis; rather, as discussed above, Defendants did not order these diagnostic tests because Hoffman's other scans and physical evaluations did not raise any concerns about cancer. Once again, Hoffman's claim against Defendants fails.

Finally, Hoffman complains that Defendants have refused to give him pain medication despite his severe, chronic lung pain. This is not so. Hoffman's medical record indicates that Defendants provided Hoffman with various medications to treat his pain, including Tylenol #3, Baclofen, Mobic, Tegretol, Motrin, and Prednisone. Defendants did so despite Hoffman's history of drug use, which requires them to give careful consideration before prescribing pain medication. (Id. ¶ 9). At bottom, Hoffman's mere disagreement with Defendants' selected course of treatment does not give rise to an Eighth Amendment claim.

In sum, Defendants have consistently provided Hoffman with diagnostic testing, referrals to outside physicians, and medication to alleviate his purported lung pain. As such, no reasonable jury could conclude that Defendants were deliberately indifferent to Hoffman's medical needs in violation of his Eighth Amendment rights. Accordingly, the Court will enter judgment in favor of Defendants on this claim.

### 2.    Urinary Incontinence

Hoffman contends he submitted numerous sick call slips complaining of urinary incontinence but Defendants failed to treat him or otherwise respond to his complaints.

(Compl. ¶ 47). Hoffman believes his urinary incontinence is the result of "irreversible . . . bladder and colon damage." (Id.).  Additionally, Hoffman states that Defendants should have given him an MRI or PET scan in order to rule out colon cancer. (Id.).

Hoffman's complaint of irreversible bladder and colon damage is not supported by evidence in the record. Hoffman appears to base this self-diagnosis on his 2016 bone scan, which he believes shows "abnormal areas of activity involving the urinary bladder and kidneys." According to Defendants, however, Hoffman's analysis misconstrues the results of the bone scan, as such scans are intended to detect "radioactive localization," which commonly presents in the urinary tract. (Mar. 5, 2018 Getachew Aff. ¶ 12). In other words, "bone scan activity in the kidneys and bladder is normal," not "abnormal" as Hoffman suggests. (Id.).

Additionally, Hoffman's medical records show that Defendants took reasonable steps to treat his complaints of urinary incontinence. Hoffman was treated with antibiotics in July 2017 after he presented with symptoms consistent with a urinary tract infection. When Hoffman began to complain of increased urinary frequency, Defendants ordered blood and urine tests and a digital rectal exam to reach a diagnosis. Hoffman's lab results were unremarkable and his digital rectal exam indicated that his prostate was not enlarged. Hoffman's complaints of excessive urinary frequency eventually ceased by May 2019 until at least December 16, 2019. (Dec. 16, 2019 Getachew Aff. ¶ 11). Further, Hoffman "does not currently present with urinary frequency symptoms needing treatment." (Id.). As such, no reasonable jury could conclude that Defendants were deliberately indifferent to Hoffman's urinary incontinence in violation of his Eighth Amendment rights.

### 3.      Degenerative Bone Disease

Hoffman asserts that Defendants have failed to treat his degenerative joint disease ("DJD") in his knees and foot, which he claims he was diagnosed with in April 2016 after undergoing a bone scan. (Compl. ¶ 49). Hoffman contends that Defendants refuse to refer him to an orthopedist for testing and have rejected his "many attempts" to get a knee or foot brace. (Pl.'s Opp'n ¶¶ 16, 18). Hoffman also states that he is only receiving 600 mg of Motrin twice a day, which is insufficient to address his joint pain. (Id. ¶¶ 16, 43).

Hoffman's assertion that he has DJD is not supported by evidence in the record. According to his medical records, the results of Hoffman's 2016 bone scan indicated "minimal degenerative appearing uptake in both knees and the right foot." (Medical Records 1 at 13, 15). This result did not indicate DJD, but rather was entirely normal, as "[m]inimal degenerative changes are common to most humans as they age." (Mar. 5, 2018 Getachew Aff. ¶ 13). Thus, although Hoffman complains of joint pain, it does not appear that his pain is the result of untreated DJD.

Furthermore, the record indicates that Defendants have appropriately treated Hoffman's general complaints of joint pain. On at least one occasion Defendants ordered a knee brace for Hoffman upon his request. Defendants also recommended other therapies for Hoffman, such as stretching before physical activity and using ice to alleviate pain. As Hoffman admits, Defendants prescribed him Motrin for pain relief. Although Hoffman believes that referral to an orthopedist and additional pain medication is warranted, his dissatisfaction with Defendants' chosen course of treatment is insufficient to support a claim for deliberate indifference. See Peterson, 551 F.Supp. at 146. In all, Defendants have

provided Hoffman constitutionally adequate treatment for his knee and foot pain. As such, this claim also fails.

In sum, the evidence in the record demonstrates that Defendants were not deliberately indifferent to Hoffman's lung condition, urinary incontinence, and joint pain. Accordingly, the Court will enter judgment in favor of Defendants as to Hoffman's Eighth Amendment claim.

### 2. First Amendment Retaliation

Hoffman alleges that Defendant Pierce retaliated against him for filing a grievance against her.[15] In order to set forth a colorable retaliation claim under § 1983, a plaintiff must allege that: (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. See Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005). In light of the facts alleged in Hoffman's Verified Complaint, the Court finds that summary judgment on Hoffman's retaliation claim is inappropriate at this time.

First, Hoffman has adequately alleged that he engaged in protected First Amendment activity. The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official

---

[15] Hoffman also alleges that Defendants retaliated against him by falsifying his medical records, which caused him to receive inadequate medical treatment. Because the Court finds that Defendants provided Hoffman constitutionally adequate medical treatment, the Court need not address this argument in the context of Hoffman's First Amendment retaliation claim.

for the exercise of that right. <u>Suarez Corp. Indus. v. McGraw</u>, 202 F.3d 676, 685 (4th Cir. 2000). Indeed, the Fourth Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. <u>Booker v. S.C. Dep't of Corrections</u>, 855 F.3d 533, 545 (4th Cir. 2017). Here, Hoffman alleges that he filed a grievance against Pierce on October 17, 2016 concerning what he claimed to be her "unprofessional conduct and negligence" during his medical appointment on October 14, 2016. (Compl. ¶ 30). Thus, Hoffman has adequately alleged that he engaged in protected conduct.

Second, Hoffman has adequately stated that Pierce's action affected his First Amendment rights. For purposes of a First Amendment retaliation claim, a plaintiff suffers adverse action where the defendant's conduct would "deter a person of ordinary firmness from the exercise of First Amendment rights." <u>Martin v. Duffy</u>, 858 F.3d 239, 249 (4th Cir. 2017) (quoting <u>Constantine</u>, 411 F.3d at 500). Here, Hoffman alleges that, after he filed the grievance against Pierce, she filed a false claim that Hoffman had threatened her, which caused him to be placed in administrative segregation for forty days. (Compl. ¶ 31). Certainly, "placing an inmate in administrative segregation could deter a person of ordinary firmness from exercising his First Amendment rights." <u>Martin</u>, 858 F.3d at 250 (citing <u>Herron v. Harrison</u>, 203 F.3d 410, 416 (6th Cir. 2000)). As such, Hoffman has adequately alleged the second element of his retaliation claim.

Lastly, Hoffman has sufficiently alleged that Pierce filed the false complaint in response to his grievance against her. In general, a plaintiff may demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action using

circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity and that the retaliation took place within some "temporal proximity" of that activity. See Constantine, 411 F.3d at 501. Hoffman alleges that Pierce filed the false complaint on October 27, 2016, less than two weeks after he filed the grievance against her. (Compl. ¶¶ 30–31). Accordingly, Hoffman has adequately stated a causal connection between his First Amendment conduct and Pierce's retaliatory action.

Importantly, Defendants do not address Hoffman's First Amendment retaliation claim in their Motions, nor do they offer any evidence to counter Hoffman's allegations. Thus, at this stage in the litigation, the Court declines to enter summary judgment for Defendants on this claim.

### III.   CONCLUSION

For the foregoing reasons, Defendants' Second Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 72) will be granted in part and denied in part. Hoffman's "Motion to Dismiss Defendants' Renewed Motion, or in the Alternative Motion for Summary Judgment" (ECF No. 74) is deemed an Opposition to Defendants' Motion and the motion will be terminated. Hoffman's Motion to Appoint Counsel (ECF No. 24), which was previously denied, will be reopened and granted. A separate Order follows.

Entered this 17th day of September, 2020.

_____/s/_____
George L. Russell, III
United States District Judge
